### M. H. DETRICK CO. v. CHICAGO FIRE BRICK CO.
### No. 5325.

Circuit Court of Appeals, Seventh Circuit.
June 7, 1935.

Franklin M. Warden and Comfort S. Butler, both of Chicago, Ill., for appellant.

Max W. Zabel, Arthur W. Carlson and Greek Wells, all of Chicago, Ill., for appellee.

Before SPARKS, FITZHENRY, and ALSCHULER, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from a decree dismissing appellant's bill of complaint which charged appellee with infringement of four patents. Only three of the patents are involved in the appeal. They are Hosbein, No. 1,544,580, issued July 7, 1925, on an application filed August 3, 1921; Stevens and Hosbein, No. 1,628,284, issued May 10, 1927, on an application filed November 9, 1920; and Hosbein and Foltz, No. 1,628,318, issued May 10, 1927, on an application filed April 14, 1921. They all relate to furnace arch construction. The answer was invalidity and non-infringement.

A general statement with respect to furnace arch construction will be helpful in grasping the underlying principles of all the patents in suit.

The main furnace arch is the top or roof portion of the combustion chamber. It is comprised of walls formed of refractories, otherwise known as fire brick or tile. This arch in cooperation with the side walls confines the hot gases and radiant heat, thus efficiently applying them to the work for which the furnace is intended, principally the heating of boilers for the generation of steam.

Refractories and the manner of supporting and assembling them are quite important in the construction and operation of high temperature furnaces.

Formerly the main arch was a masonry structure reaching from one side wall to the other and arched over the combustion chamber. It was supported by the walls and was commonly called a sprung arch. The theory of it was that it would rise in the center to accommodate expansion caused by heat, and would lower with the contraction incidental to cooling, without displacing the ends. It was found, however, that the lower, weaker portions of the component refractories would break, due to the extra pressure of expansion, thus requiring repairs which involved the entire arch. For this reason the sprung arch was superseded by the suspended or flat arch, wherein the refractories are suspended by means of hangers carried upon a metallic framework. Refractories are made of high grade fire clay and expand as the furnace temperature increases. Upwards of 2,000° F. they become incandescent. Expansion of individual refractories is not uniform throughout, due to the fact that different degrees of heat are applied to different portions of the refractory unit. This causes different degrees of expansion in the same unit and sometimes causes it to break. If a portion becomes vitrified or glassy by high temperature, a slight change in the temperature may cause it to crack and fall off. Also in arch structure, expansion of individual refractories causes them to exert pressure upon others, which may cause breakage. The breaking away of refractories is called "spalling." Again, portions of the ash of various fuels may become more or less molten in high temperatures. This molten ash is carried up in the burning gases and engages and adheres to the arch refractories, thus causing them to melt and slough off. This is known as "slagging."

The furnace arch must be a tight wall to prevent heat leakage. Steel structural elements rapidly lose strength at temperatures above 1,000° F. Hence, the metallic hangers and framework supporting the arch require protection from the fire, and for that reason the refractories must fit closely together.

Temperature is a principal factor in furnace productivity. On the other hand, the higher the temperature, the more destructive is its action on the refractory arch. Appellant's disclosures, therefore, are alleged to be directed toward improvements in the shaping, arrangement and supporting of refractories to provide arches

that will increase productivity and efficiency, and enable the refractories to best resist the destructive influences of high temperatures, and permit ready removal and replacement in making arch repairs.

We shall discuss first the patent to Stevens and Hosbein. In order to present more clearly the objects and claims of this patent, we here insert Fig. 1 of the patent in suit, and Fig. 2 of Duncan, No. 1,179,084, a patent of the prior art:

The patent in suit was asserted by the patentees to be adapted for use in furnaces equipped with either over-feed or traveling grate stokers. The drawings accompanying the application illustrate a travel-grate stoker, 12, as does Duncan, 10. In each the coal is carried continuously into the fire box by the traveling grate, where it is supposed to be burned to an ash by the time it makes its exit at the opposite end of the fire box. In order to accomplish that re-

Fig. 1
of
Stevens-Hosbein
patent in suit.

Figure 2 of Duncan 1,179,084.

sult and thus benefit by the greatest possible combustion in the shortest time, it was quite necessary that the coal ignite as quickly as possible after entering the fire box. Duncan recognized that necessity, and for that purpose he provided an ignition arch, 21. He closed the forward end of the combustion chamber by a partition wall, 20, extending it down to a point somewhat above the opening gate, 12, thus forming the ignition arch over the forward end of the fuel bed. 15 represents the main arch, or roof, of the combustion chamber extending rearwardly to the convex combustion arch, 17, which gives passage for the gases into space 19 before they come into contact with the boiler. The roof, 15, is substantially parallel to the grate, so that the direct radiation of heat to and from the fuel bed is obtained at all points throughout the length of the fuel bed. However, the record fairly discloses that in Duncan the coal, upon entering the furnace, did not ignite until it had traveled some distance to the left of the entrance, and not to any appreciable extent until it had passed the left end of the ignition arch, 21. For that reason, it may fairly be said from the record, the travel-grate stoker was not successful with certain classes of coal. That was the problem which Stevens and Hosbein claim to have solved by the patent now under consideration. Its essential feature is the placing of an ignition arch of the character and for the purposes described in the contested claims 5, 7, 9, 22 and 24,[1] at and over the fuel inlet.

The court held that these claims were not infringed and were invalid in view of Duncan, Nos. 958,379 and 1,179,084, Detrick, No. 1,309,433, Lewis and Kerr, No. 1,-686,976, and Crowe, No. 713,968, and also the Western Electric construction. With the exception of Lewis and Kerr these references were not considered by the Patent Office.

It will be observed that the claims in suit are directed only to ignition arches at the fuel inlet. What patentees did was to substitute a multi-tile convex ignition arch structure in place of Duncan's square-cornered ignition arch, and it solved the problem by permitting more radiated and reflected heat to go into the entrance chamber beneath the ignition arch. For ignition purposes the effect was the same as if the lower left-hand corner of Duncan's arch had been cut off along the unnumbered line shown thereon, which does not appear on the original figure. However, Duncan's device thus modified probably would not have been successful, because of its construction. His steel would have been more nearly exposed, and his one-tile arch

[1] "5. In a furnace, an ignition arch comprising a plurality of frames having their lower extremities disposed adjacent the fuel inlet and each including a tile supporting portion extending inwardly and upwardly from its lower extremity, said tile supporting portion carrying tile retaining members, and wedge-shaped tile connected at their smaller ends with said retaining members to retain juxtaposed tile with their converging faces in abutment, the larger end surfaces of said tile forming a fire resisting wall extending first inwardly and then abruptly upwardly from the fuel inlet."

"7. In a furnace, an ignition arch comprising a plurality of collaterally disposed frame members having their lower extremities disposed adjacent and above the fuel inlet, each of said frame members including an inwardly and upwardly extending part carrying tile retaining members, a plurality of wedge-shaped tile engaged at their narrower ends with said retaining members, the tile on each frame member being disposed with the converging faces of juxtaposed tile in abutment whereby the exposed end faces of the tile form a substantially regular convex arch surface extending inwardly and upwardly from the fuel inlet."

"9. In a furnace, a fire box arch, a transverse suspension beam arranged in front of said arch, and a convex arcuate ignition arch made up of refractory tile suspended from said beam at the front of the fire box chamber, each of said tile presenting but a single face within the combustion chamber."

"22. In furnace construction, collaterally arranged frame members, wedge shaped tile suspended thereon with their broader end surfaces exposed within the furnace chamber and their narrower end surfaces exposed outside the furnace chamber, and a wall spaced from the outside ends of the refractories to afford an intervening air duct for circulation of air across said ends of the refractories."

"24. In a chain grate furnace, the combination with a roof arch over the combustion chamber, of a convex ignition arch suspended at the front of the roof arch and presenting a refractory surface curving inwardly and upwardly from the fuel inlet to accommodate and concentrate heat reflected from the roof arch onto fuel on the grate at the fuel inlet."

would have been exposed to the increased heat on two surfaces, whereas patentees' multi-tile arch is exposed on but one end surface. However, the multi-tile convex arch which patentees use was not new in the art. It appears in Lewis and Kerr, No. 1,686,976, issued October 9, 1928, on an application filed May 29, 1920, and also had been used in the Western Electric unpatented device since April 28, 1918, which is here set forth:

CHAIN GRATE

▉ In this figure the coal entrance is at the lower left-hand corner, and the ignition arch just above it is the same as in Duncan. The multi-tile convex arch appears at the right end of the roof arch, where the heat is permitted to come into contact with the boiler. The question is thus narrowed to whether it was invention for Stevens and Hosbein to use the admittedly old multi-tile convex arch on their ignition arch. It is true that a new use of an old device may be patentable, and that is the theory upon which appellant must and does rely to sustain the patent. It insists that the new use here was to ignite the coal nearer the door. We conceive that to be the result, rather than the use. The object was to get more radiated and reflected heat nearer the door. Patentees did this by the use of the convex arch instead of the square-cornered arch which prevented the radiation and reflection from reaching the chamber near the door. That was precisely the use of the arch with respect to the chamber near the boiler.

When the application for this patent was filed, it was placed in interference with Lewis and Kerr, which, in point of time, preceded Stevens and Hosbein in conception, explanation to others, first drawings, written description, and reduction to practice. Lewis and Kerr's arch was used at the entrance of the chamber near the boiler, and not as an ignition arch near the door. There were six counts of the interference and they related to multi-tile convex arches. The first five counts were not limited in location; the sixth, however, was limited to an ignition arch above the fuel inlet. The interference was settled by concession of priority in which Stevens and Hosbein conceded priority to Lewis and Kerr as to the first five counts, and they, in turn, conceded priority to Stevens and Hosbein as to count 6. The form and construction of the arch referred to in each count, however, was antedated by the Western Electric installation. We think the patentees made no new use of the multi-tile convex arch, and their disclosure with respect thereto did not amount to invention. They merely used an old arch in a new place and by it produced precisely the same direct result which its prior use had produced.

Moreover, the form of the arch, or its equivalent, was previously used in Detrick, No. 1,309,433, and in Crowe, No. 713,968. It is true that in both of these the ignition arch was of single tile rather than multi-tile construction, but the issue before us is one of location rather than form or composition, for patentees were antedated both as to form and composition by Lewis and Kerr and the Western Electric installation.

It is also true that Detrick employs an over-feed stoker and his ignition first occurs underneath the coal and away from the fuel inlet, but the beveled arch which he uses at the fuel gate is certainly an equivalent to the ignition arch which Stevens and Hosbein use, and it permits radiated and reflected heat to reach the fuel entrance whereby the coal by means of the increased heat will more quickly ignite when it reaches the place of ignition. It will also be recalled that Stevens and Hosbein expressly declared that their ignition arch was especially adapted for use in both over-feed and travel-grate stokers.

Claim 5 is to be distinguished from Lewis and Kerr merely in that claim 5 provides that each tile retaining member completely supports one tile, whereas in Lewis and Kerr each tile is held between two collaborating flanges of adjacent tile retaining members. The method described in claim 5 was old in the art, as will appear in Lemb,.

No. 1,275,709. Claim 6 we think is completely anticipated by Lewis and Kerr, and it differs from claim 5 in no material respect. Claim 22 is not different from Lewis and Kerr, except that it provides a wall back of the ignition arch for the purpose of forming an air duct. The space here provided seems to us to form a pocket with no outlet except at the bottom. Just how it would function as an air duct we are not able to understand. It seems, however, to have been old in Detrick, which was not cited, nor did Detrick claim it as invention.

Claims 9 and 24 cover a combination of a multi-tile convex arch with a top or fire box arch. Both Crowe and Detrick had such combination with a single tile arch, and we are unable to perceive invention in combining a top arch with a multi-tile convex ignition arch, as both elements were old, and their combination produces no new result, nor does it produce an old result in a more facile, economical or efficient way. It will be observed also that claim 24 is not limited to a multi-tile ignition arch. We think the court's ruling was correct in holding the specified claims of this patent invalid for lack of novelty. The Hosbein and Foltz patent is well illustrated by the following figures:

Claims 14, 15 and 21 were involved and were held invalid for lack of novelty. Appellant now declines to press his charge of infringement as to claim 21. Claim 14 is typical of the two claims relied upon and is as follows:

"14. In furnace arch construction, the combination of collaterally arranged brackets, courses of wedge-shaped refractories suspended by their narrower ends from said brackets and having their broader ends associated to form a convex arch portion, shelf portions projecting over the topmost of said refractories, and an apron wall supported on said shelf portions independently of the wedge-shaped refractories and in conjoining association with the convex arch portion."

This patent is a combination involving four elements: (1) Collaterally arranged brackets, 19, (2) wedge-shaped refractories, 21, forming a multi-tile convex arch such as hereinbefore discussed in the patent to Stevens and Hosbein, (3) an apron wall, 29, and (4) a shelf portion, 28, for partially supporting that apron. The construction provides a plurality of brackets which are arranged laterally across the furnace chamber at the rear end of the arch. On these brackets are supported wedge-shaped refractories, which are arranged to form a

Fig. 1.

Fig. 2.

The purpose of this construction was to provide a secure closure for the furnace chamber at the rear end of the roof arch. convex arch at the rear end of the roof arch. The brackets have shelf portions which project over the wedge-shaped re-

fractories, upon which the apron wall is supported with its lower end in conjoining association with the convex arch. The elements involved were all old in the art but the novelty claimed is that the rear end of the arch and the apron wall are both supported on the same brackets, and the weight of the apron is not imposed on the arch. The benefits claimed are that the refractories are safeguarded against breakage by the weight of the apron and they are thus permitted to expand without restriction and may be removed and replaced without tearing down the apron wall or in any way jeopardizing it, all in such manner as to employ the thermal expansion of the refractories to keep the joint between the end of the arch and the bottom of the apron wall closed, thus preventing leakage of flame or hot gases contacting the metallic supporting members, and the contact of cold air with the heated refractories.

Means for separately supporting an apron or curtain wall were quite old in the art as shown by the Western Electric construction, referred to in the discussion of the Stevens and Hosbein patent, also Thomas, No. 1,372,848; Duncan, 1,179,084; Bigelow, 1,463,241; and Liptak, Nos. 1,491,-243, 1,494,848, and 1,347,514, none of which were cited in the Patent Office. It is true that in Western Electric the apron is supported separately by a transverse I beam, which is not connected with the brackets supporting the refractories, and it may be true, as asserted by appellant, that a part of the apron extends below the I beam and that its weight apparently rests upon the arch. Of this, however, we are not certain. The drawing discloses a very short apron. The left end of the boiler rests upon the top tile of the apron. Between the boiler and the arch there appear to be six bricks, three of which are below the bottom of the I beam. Whether or not any part of that space is an expansion joint the drawing does not indicate. But be that as it may, it discloses the use of a multi-tile convex arch with at least a part of the weight of the apron separately supported. To support it entirely by either lowering the I beam or lengthening the vertical part of

the arch and using an expansion joint would scarcely involve inventive genius. If this were done, every benefit claimed for the patent would be present, except that of having the apron support attached to the bracket which supports the refractories. In all the patents just referred to the weight of the apron does not rest upon the arch, and in all of them, except Duncan, both loads are carried ultimately by the same beam. In the Thomas and the Liptak patents the support of the apron which is the equivalent of patentees' shelf, 28, lies between the apron and the arch. It is to be noted that in the patent before us most of the weight of the apron is not carried by the table, 28, but by two steel girders which extend underneath the apron for more than half the thickness of the apron wall. It is further to be noted that patentees' table, 28, is optional, which they say they sometimes use, and their drawings show both methods of construction. The table was not added until the granting of the original patent, which was based almost exclusively upon the disclosure of the multi-tile convex arch.

It is further contended by appellant, with respect to the Thomas and Liptak patents, that substantial longitudinal expansion of the arch would displace the end arch tile. That is quite true, but that is due to the fact that in those devices the multi-tile convex arch is not used. Holding as we do that that arch is not of his invention, we think it adds nothing novel to his combination. The mere adding of the table support, 28, as a part of his refractory support we think does not amount to invention. It would be at least analogous to adding braces to the radius rods of an automobile which this court held not to be patentable in Walker Manufacturing Company v. Illinois Brass Manufacturing Company, 265 F. 279.

■ Hosbein patent No. 1,544,580 is directed to various features of arch construction, but the claims here in issue involve only the relationship of the tile suspension members to the brackets and to the tile, and to the specific construction of the tile. The court held claims 13, 34, 35, 36 and 37 invalid, and held claim 27 valid but not infringed.[2]

2 "13. In a furnace an arch construction the combination of an arch bar formed with a supporting flange, means for supporting said arch bar, a plurality of supplemental supporting members supported on said flange and susceptible of longitudinal movement thereon, and a plurality of tile supported on each of said supplemental supporting members, the tile on respective supporting members being associated to form a continuous furnace arch wall."

"27. In a furnace arch construction, in combination, an arch bar, hangers sup-

The following drawings are explanatory:

the structure in such manner that they may readily accommodate themselves, individu-

Hosbein patent 1,544,580.

The advantages of the construction as claimed by appellant are that it gives the arch structure proper flexibility as among its component refractories; it permits the use of small, or half-width, refractories resulting in less surface exposure, and less internal stress due to variations in expansion; it facilitates installation and removal of the refractories, and supports them in ally and in groups, to changes in position occasioned by expansion; it so retains the refractories in the structure that their movements relative to one another, incident to expansion and contraction do not impose dangerous stresses on the parts which engage the supporting members. It is said to be particularly advantageous in convex or radial portions of the arch structure.

ported on respective bars and shiftable longitudinally thereon, a plurality of arch tile suspended on each hanger independently, said tile being shiftable with their supporting hangers and removable therefrom individually."

"34. As an article of manufacture a furnace arch portion comprising identical wedge shaped refractories provided at one side of their narrower ends with a notched corner portion and hook receiving pocket extending inwardly therefrom and terminating short of the converging faces of the refractories, and the lateral faces of the refractories being parallel.

"35. An arch construction comprising the combination with the top arch, of supporting brackets arranged along a margin thereof, suspension members movably supported on the brackets at different elevations, and wedge-shaped tile suspended on the suspension members in courses terminating at the margin of the top arch, the tile in the respective courses being disposed edge-to-edge and the movable suspension members accommodating their expansion and contraction.

"36. As an article of manufacture, an arch nose portion comprising complementary wedge-shaped refractories having parallel lateral sides and notched inner corner portions at their narrower ends, said narrower end portions being provided with hook-receiving pockets disposed to align when the refractories are arranged with lateral faces in abutment and the converging faces in approximate alignment.

"37. An arch nose construction comprising a vertically extending supporting bracket, tile supporting members adjustably supported thereon at different elevations, wedge-shaped tile suspended on said supporting members and shiftable therewith relative to the bracket, said wedge-shaped tile being disposed with their convergent faces juxtaposed and their narrower extremities in engagement with the supporting members."

In this patent a supporting bracket, 40, constituting the rear portion of an arch bar, 7, is provided with a flange, 41, on which is adjustably mounted a plurality of suspension, or tile supporting members, 42, which are movable longitudinally of the bracket. On each suspension member are suspended two tile, 31. The tile supporting members have laterally extending portions, 42a, on which the tile hang. The tile are notched at one upper corner and provided with pockets to receive the portions, 42a, which pockets terminate short of the side walls of the tile to prevent it from sliding off the portions, 42a, thus permitting a swinging or rocking movement of the tile relative to the suspension member, rather than a sliding movement. Each tile supporting member, 42, carries two tile, and, due to the adjustability of the tile supporting member on the bracket, each of said tile is movable on the tile supporting member independently of the other, although both are supported on the same tile supporting member.

Appellee's alleged infringing construction, like that of the patent, is designed for use in both flat and convex arches. In the drawings of appellee's structure there is disclosed, for use in a flat arch, an arch bar with which a link is in engagement, which in turn supports a hanger, and it in turn supports a plurality of tile, four in number, but the hanger is not supported by the flange of the arch nor is it susceptible of longitudinal movement thereton. A similar structure is used with a convex arch but the links are not supported by the flange of the arch bar nor the flange of the bracket, and it likewise is not susceptible of longitudinal movement thereon.

The court held that claim 13 was not infringed by appellee's device, and that it was invalid by reason of the prior disclosures of Duncan, Nos. 958,379 and 1,179,084 which were not cited in the Patent Office. We think that ruling was correct. In the latter Duncan patent there is an arch bar, a link supported by the web and not the flange, a hanger, a plurality of tile on the hanger, and longitudinal movement on the arch bar. It is obvious that if this claim is infringed by appellee's device the claim is invalid because it was anticipated by Duncan, No. 1,179,084. In Duncan, No. 958,379, we think anticipation is clear. There is the suitably supported arch bar with supporting flanges, a plurality of supplemental supporting members or hangers, supported on the arch flanges and susceptible of longitudinal movement thereon. There is also a plurality of tile supported on each supplemental supporting member, and the tile are so associated as to form a continuous furnace arch wall. The claim seems to read perfectly on this patent, and we think it is invalid.

Claim 27 is not limited to a convex arch. It was held valid, no doubt because of the feature of individual removability of the tile. The history of this claim as disclosed by the file wrapper requires that it be given a very restricted construction. Appellee's construction has four tile on one hanger, thus precluding individual removability. They are not shiftable with the hanger and are not shiftable along the bar. On the contrary, they are held in notches. This construction is quite a close copy of Duncan, No. 958,379, and we are convinced there was no infringement of the patent in suit.

Claims 34 and 36 relate to the construction of the tile, and they were held invalid because anticipated by the following prior art patents: Stevens, 1,544,869; Lewis and Kerr, 1,686,976; Duncan, 1,179,084; Junge, 773,149; Tanner, 1,164,680; Cheney, 952,-232 and Rearick, 739,218, and also the Western Electric installation which was referred to hereinbefore in the discussion of the Stevens and Hosbein patent. None of these patents, except Junge, were cited by the Patent Office.

As will be observed, the alleged distinguishing characteristics of appellant's tile are the notched corner and the pocket. Appellee's tile has the notched corner which was quite old, but instead of a pocket it has a hole completely through the tile for the purpose of support. Clearly we think there is no infringement here. In view of the art upon which the court relied, especially Cheney, we think there was no invention.

With respect to claims 35 and 37, while appellant assigns error in the court's holding that they were anticipated by, and invalid because of, the disclosures of Lewis and Kerr, No. 1,686,976 and Lemb, 1,275,-709, it does not discuss them, nor does it point out to us the novelty of the claims. We are unable to discover novelty after a study of the Western Electric installation and the following patents: Duncan, 1,006,-368; Stevens, 1,230,441; Lemb, 1,275,709; Cheney, 952,232; Junge, 773,149; Stevens, 1,544,869; and Lewis and Kerr, 1,686,976.

Decree affirmed.